[No. 13131.    Department Two.  ° April 1, 1916.]

CHARLES M. BARR, *Respondent*, v. KERFOOT INVESTMENT
COMPANY, *Appellant*, E. G. KERFOOT *et al.*,
*Defendants*.[1]

PAYMENT—EVIDENCE—SUFFICIENCY.  Findings that a payment of
a balance of $410.82 was not made is sustained by evidence to the
effect that the debtor waived a lien in order to allow the creditor
to obtain advances from an insurance company, and the creditor
paid $10.82 and transferred four shares of capital stock of the par
value of $400, agreeing to pay ten per cent interest and retaining
an option to buy it back, and upon liquidation of the corporation,
substituted four shares in another company under like agreement,
reciting that it was held as collateral.

APPEAL—REVIEW—FINDINGS.  Findings upon conflicting evidence,
where the trial court heard and saw the witnesses, will not be dis-
turbed on appeal, where the evidence does not preponderate against
them.

Appeal from a judgment of the superior court for Frank-
lin county, Linn, J., entered April 22, 1915, upon findings in
favor of the plaintiff, in an action to foreclose a lien on cor-
porate stock, tried to the court.    Affirmed.

*Gerard Ryzek*, for appellant.
*Chas. W. Johnson*, for respondent.

HOLCOMB, J.—This case presents nothing but a question
of fact.   The statement of facts shows Barr performed serv-
ices and furnished materials to the Kerfoot Investment Com-
pany in the construction of a hotel building, amounting to
$1,594.18, and received from time to time in payment sums
aggregating $1,183.82, leaving a balance due on December
18, 1912, of $410.82.   On that day, as he and his wife (who
was also his bookkeeper) testified, he gave, at the request of
E. G. Kerfoot, president of the Kerfoot Investment Company,
a receipt for $410.82, in order to waive a lien and satisfy

[1]Reported in 156 Pac. 392.

the Continental Insurance Company, which was making a loan on a hotel building to the Kerfoot Investment Company. On the same day, E. G. Kerfoot, of the investment company, delivered to Barr four shares of the stock of the Kerfoot Hardware Company, a corporation, of the par value of $100, and at the same time presented to Barr for execution by him a written agreement to the effect that the Kerfoot Hardware Company agreed to pay Barr interest at the rate of ten per cent per annum on the four shares of stock, and that Barr should sell the stock to the hardware company upon demand at a price not exceeding $100 per share, and that, should Barr desire to sell the stock, he should first offer it to the hardware company. This agreement was signed by the Kerfoot Hardware Company, by E. G. Kerfoot, and by Barr, *as made in duplicate*. On that day the Kerfoot Investment Company paid to Barr, by a check, $10.82, which was credited, leaving a balance of $400, which the Barrs did not at the time discharge on their books.

Later, Kerfoot liquidated the affairs of the hardware company and he and his wife voluntarily offered to, and did, subtitute for the hardware company's stock four shares of stock of the Kerfoot Hotel Company, a corporation, of the par value of $100 each, on May 1, 1913, and also presented to Barr an instrument to be, and which was, signed by him, reciting a consideration of one dollar and other valuable considerations, and agreeing to sell to E. G. Kerfoot and Gertrude W. Kerfoot the last mentioned stock, at the price of $100 per share, at any time within five years from date, and not to sell or dispose of the stock to any one else without first offering it to E. G. or G. W. Kerfoot. It was also therein stipulated that, "This stock is held as collateral and bears ten per cent interest per annum. It does not participate in any dividends." This stock was issued directly to Barr by E. G. Kerfoot, as president, and G. W. Kerfoot, as secretary; but, as was said, it was voluntarily substituted by them in lieu of the stock of the Kerfoot Hardware Company and ap-

parently under the same arrangement. E. G. Kerfoot admitted in his testimony that: "The waiver of the lien by Barr was required by the life insurance company. They wouldn't advance money unless I got waivers from every one that done work on the building." This admission, together with the testimony by Barr and wife, is ample to explain and avoid the receipt for $410.82 on December 18, 1912.

The Kerfoots, husband and wife, contended and testified that the original transfer of four shares of hardware company's stock was for the purpose of satisfying in full the balance of $400 remaining due on December 18, 1912; while Barr and wife contended that the stock was delivered merely as collateral for the payment of the $400 then remaining unpaid. If the stock was sold absolutely to Barr in payment of the debt of $400, it is strange that they would, so to speak, "keep any strings" on it, that Barr could not sell it to any one else, and that they would pay ten per cent interest upon it while they stipulated that it should not participate in any dividends; and it is strange, also, that they would feel called upon to substitute for the hardware company's stock, when the hardware company's affairs were liquidated, an equal amount of stock in the Kerfoot Hotel Company and under a similar arrangement. It was also then agreed, upon the substitution of the hotel stock, *that it was held as collateral and that ten per cent interest should be paid upon it, and that it should not be sold to any one else but the Kerfoots.* Barr originally attempted to hold both the Kerfoots personally and the Kerfoot Investment Company for his indebtedness. The trial court very properly held that the Kerfoots could not be held personally for their promise which, as testified to by the Barrs, was made orally, and comes within the statute of frauds, the debt being the debt of the Kerfoot Investment Company or of the Kerfoot Hotel Company.

The trial judge held that there had been no payment of the $400. As to this there is a direct conflict in the evidence between the Kerfoots and the Barrs, and we have con-

sistently held that in such a case a trial court, having the opportunity of viewing the witnesses and their demeanor and credibility, is the better judge of the credibility and of the weight of the evidence, and where the evidence does not preponderate against his finding we will not disturb the same. The trial judge might have decided either way. Having decided in favor of respondents and there being nothing to preponderate against the same, the finding and judgment of the trial court should be sustained.

Affirmed.

MORRIS, C. J., PARKER, and MAIN, JJ., concur.